In the Matter of the Application of JAY BECK, Also Known as JACOB B. BICKOVSKY, Petitioner, for an Order of Mandamus against JAMES E. FINEGAN and Others, as the Municipal Civil Service Commission of the City of New York, and WILLIAM H. ALLEN, as Secretary of Such Commission, Defendants.

Supreme Court, Special Term, New York County, September 23, 1937.

*Boochever, McManus & Ostrow* [*George Boochever* and *David Regosin* of counsel], for the petitioner.

*Paul Windels, Corporation Counsel* [*Robert H. Schaffer* of counsel], for the respondents.

PECORA, J. This is an application by the petitioner, Jay Beck, for either a peremptory or alternative order of mandamus, to compel the respondents, composing the municipal civil service commission of the city of New York, to restore him to the eligible list for appointment to the position of director (education) of men, department of correction. The facts are virtually undisputed.

In 1926 the petitioner, then about twenty-five years of age, was the secretary of a building and loan association, of which his father was the dominant figure, in Philadelphia, Pa. In connection with a certain transaction of that association, Beck fraudulently certified to the adoption of a resolution of its board of directors. He was indicted for this crime, and in 1929 pleaded guilty and was sentenced to an indeterminate term of from two to five years in the Philadelphia County Prison. His father was likewise indicted in connection with the same or similar transactions, and upon conviction was sentenced to a longer prison term. After serving his minimum term the petitioner was released on parole in 1931. In 1933 he was granted a complete and unconditional pardon by the Governor of Pennsylvania.

Upon his release Beck came to New York city to devote himself to the study and practice of sociology and penology. He entered the employ of the Emergency Work Bureau doing research in penology; he became director of research of Casa Italiana Educational Bureau at Columbia University, supervising a sociological

study of Italians in New York city, and handling truant cases of the Benjamin Franklin High School; he entered Columbia University on a scholarship, and after three years' study was awarded a baccalaureate degree after majoring in sociology; he was placed in charge of a W. P. A. project in the department of correction of the city of New York, working under Commissioner of Correction Austin H. McCormick, and performing penological services of a complicated nature. In all these activities he seems to have acquitted himself honorably, proving himself efficient, intelligent and trustworthy, and commending himself to his associates and superiors.

In February, 1937, Beck took a competitive examination for the position of director (education) of men, department of correction, passed it with the highest mark, and was placed at the top of the eligible list when it was promulgated by the civil service commission in May, 1937. Beck made no attempt to conceal his prior conviction.

Under section 14 of the Civil Service Law the civil service commission, in the exercise of its discretion, " may refuse to examine an applicant, or after examination to certify an eligible, * * * who has been guilty of a crime or of infamous or notoriously disgraceful conduct." Presumably acting under this power, the commission summoned Beck before it on July 7, 1937, to show cause why his name should not be stricken from the eligible list. Beck appeared before the commission and, together with proofs of the above facts purporting to show his rehabilitation, produced letters of an impressive character from responsible persons attesting to his worthiness. Despite this, he was informed by the commission that his name would be stricken from the eligible list. Shortly thereafter Commissioner of Correction McCormick personally appeared before the commission at a rehearing and urged that the petitioner's name be restored to the list. He spoke of Beck's abilities and qualifications in glowing terms, and asserted his unqualified belief that Beck had re-established himself as a citizen of high order. The commission, however, adhered to its original determination. Beck now petitions this court for an order of mandamus, peremptory or alternative, compelling his restoration to the eligib e list.

The decision on this application involves a struggle between head and heart. The complete sympathy of this court extends to the petitioner. From the record before it, the court feels fully satisfied that the petitioner has, in the face of the severe handicap arising from his conviction in 1929, been restored to a front rank in good and useful citizenship. This result could have been attained only by dint of an extraordinary character and an indomitable will

to succeed. The petitioner's life, since his conviction, amply demonstrates, in this court's opinion, that he possesses these and other admirable qualities in abundance.

One of the reasons advanced by the civil service commission for disqualifying the petitioner was, that his criminal record might impair his usefulness and influence among the prison inmates whose education it would be his duty to supervise, were he appointed to the position sought by him. This conclusion by the commission may well be a sound one. This court, however, is distinctly of a contrary opinion. It prefers to feel that the petitioner's success in fighting his way back to honor and trust would constitute a living inspiration to the prison inmates with whom he would come in contact in a supervisory relationship; and that his presence would be a shining symbol of hope to them. Frankly this court acknowledges a sentimentality which prompts it to regard the character of Jean Valjean — fictional though it be — as one which strongly appeals to humanity.

But the question which this court is here called upon to decide is entirely one of law, and must be disposed of dispassionately. It is well settled that courts cannot interfere with the discretionary judgment of administrative officers, in the absence of a clear showing that such judgment was arbitrary, capricious or unreasonable; or was the result of improper conduct on their part; or was based upon an erroneous conception of a rule of law. (*Brady* v. *Mayor*, 112 N. Y. 480; *Campbell* v. *City of New York*, 244 id. 317; *Holly* v. *City of New York*, 128 App. Div. 499; *Matter of Nalore* v. *Baker*, 244 id. 554; *Matter of Agoglia* v. *Mulrooney*; 259 N. Y. 462; 2 Fiero on Particular Actions and Proceedings [4th ed.], p. 1879.)

In the instant case the civil service commissioners fully realized that section 14 of the Civil Service Law vested them merely with a discretionary power to refuse to certify the petitioner for appointment. The record of the two hearings which they accorded to the petitioner before they finally disqualified him, clearly indicates that fact. It also distinctly shows the different processes of reasoning by which each of the three commissioners arrived at the same determination.

Were this court clothed with the sheer power to overrule the determination of the commissioners merely because its judgment of the facts conflicted with theirs, it would unhesitatingly do so. But the law has wisely refrained from granting our courts this power. It recognizes that judges are not supermen endowed with a knowledge amounting to omniscience. Hence, the law properly gives to administrative officers, who have special qualifications

based partly on experience, the power to make decisions within their official spheres; and gives to the courts the power to correct those decisions only when made without legal basis or under circumstances clearly evidencing improper conduct or an abuse of discretion. As none of these elements exists in this case, this court cannot substitute its judgment for that of the civil service commission.

Much stress has been placed by the learned counsel for the petitioner upon the case of *Matter of Nalore* v. *Baker (supra),* where the court in a case involving certain facts similar to those present in this case, in adverting to section 14 of the Civil Service Law, said: " Prior criminal guilt is but one cause, among others mentioned in the rule, which ' *may* ' prompt the commission as an administrative board to refuse to examine applicant. It is fair to assume that such an applicant would be refused only in the event his moral qualities at the time of his application, when considered in their relation to the employment he seeks, would warrant such refusal. To interpret the rule otherwise would disqualify for civil service every applicant who has been guilty of a crime regardless of the duties of the position to be filled or the nature of the crime previously committed; it would disregard both the possibility and the hope of moral reformation."

But in that same case the court further said (at p. 558): " We conclude that the question whether petitioner's conviction of a crime in 1927 disqualifies him for civil service employment in the city of Rochester is a matter of determination by the local civil service commission, in the exercise of its administrative discretion, with all relevant facts before it for consideration. Our courts may not interfere with the exercise of discretion vested by statute in administrative officers in the absence of clear and convincing proof of improper conduct on their part."

Regretfully this court feels constrained to deny petitioner's application for a peremptory or alternative mandamus order. But it does so with the earnest hope that the civil service commission may find it proper again to reconsider its determination in this case — one which it undoubtedly reached in an honest exercise of its discretion — and that it will yet see its way clear to certify the petitioner for appointment.

Settle order.