In the Matter of the Application of JAY BECK, Also Known as JACOB B. BICKOVSKY, Petitioner, Appellant, for an Order of Mandamus against JAMES E. FINEGAN and Others, as the Municipal Civil Service Commission of the City of New York, and WILLIAM H. ALLEN, as Secretary of Such Commission, Respondents.

First Department, April 29, 1938.

*Emanuel M. Ostrow* of counsel [*George Boochever* and *David Regosin* with him on the brief; *Boochever, McManus & Ostrow,* attorneys], for the appellant.

*Robert H. Schaffer* of counsel [*Paxton Blair* with him on the brief; *William C. Chanler, Corporation Counsel,* attorney], for the respondents.

MARTIN, P. J. On October 7, 1936, the municipal civil service commission held an examination for the position of " Director (Education) Men, Department of Correction." The petitioner passed the examination and his name was placed No. 1 on the list of those eligible for appointment. When he furnished his personal history it disclosed that he had been convicted of a crime. After a hearing before the commission, petitioner was advised that his name had been stricken from the eligible list for the position above mentioned, and that his name had been placed on the list of persons disqualified for employment in the city service, pursuant to the terms of rule III, section VII, of the Rules of the Municipal Civil Service Commission, which provides as follows:

" I. (a). Where the Commission has information that a candidate whose name appears on an eligible list has a questionable character or reputation, or is otherwise unfit mentally or physically to hold the position in the City Service he will be marked ' Not Qualified ' and his name withheld from certification.

" (b). The name of such person shall after due notice to him and an opportunity to be heard if he so desires, be stricken from such list if the Commission so orders. * * *

" 4. The burden of proving good character shall be upon the candidate."

Thereafter the commissioner of the department of correction, city of New York, requested a hearing on the removal of the petitioner's name from the eligible list. This application was granted and the commissioner personally appeared before the municipal civil service commission and urged a reconsideration of its action. Thereafter the municipal civil service commission advised the commissioner of correction that his request that the petitioner's name be restored to the eligible list had been denied. The petitioner then instituted this proceeding for an order of mandamus for the restoration of his name to the eligible list and for certification of his name for appointment. He urged that the action of the commissioners was arbitrary, unreasonable and capricious and in total disregard of the full, complete and uncontradicted evidence of good

reputation and character presented by him. The court at Special Term denied the application, and, in part, said: " But the question which this court is here called upon to decide is entirely one of law, and must be disposed of dispassionately. It is well settled that courts cannot interfere with the discretionary judgment of administrative officers, in the absence of a clear showing that such judgment was arbitrary, capricious or unreasonable; or was the result of improper conduct on their part; or was based upon an erroneous conception of a rule of law. (*Brady* v. *Mayor*, 112 N. Y. 480; *Campbell* v. *City of New York*, 244 id. 317; *Holly* v. *City of New York*, 128 App. Div. 499; *Matter of Nalore* v. *Baker*, 244 id. 554; *Matter of Agoglia* v. *Mulrooney*, 259 N. Y. 462; 2 Fiero on Particular Actions and Proceedings [4th ed.], p. 1879.) " (164 Misc. 334.)

The petitioner contends that he was denied a fair hearing; that the decision of the civil service commission was based upon an erroneous conception of a rule of law; that the decision constituted a gross miscarriage of justice, and that the commission is chargeable with " an abuse of discretion."

An examination of the record discloses that the petitioner was born in Philadelphia, Penn., in 1901. He there attended elementary school and high school. From 1921 to 1926 he was engaged in the real estate business. In 1926 he was the secretary of four building and loan associations in Philadelphia. In March, 1926, he was indicted in Philadelphia on the charge of grand larceny. He became a fugitive from justice, and remained so until arrested in New York in 1929 and returned to Philadelphia. He pleaded guilty on October 28, 1929, and was sentenced to a term of from two to five years in the Philadelphia County Prison. After serving the minimum sentence, he was paroled on October 28, 1931. In 1933 he was granted a complete and unconditional pardon by the Governor of Pennsylvania. At the time petitioner's application for a pardon was pending, the district attorney of Philadelphia county sent to the Philadelphia State Board of Pardons a report in opposition to the granting of the pardon. The following is a quotation from that report:

" The petitioner, Jacob B. Bichovsky, was indicted with his father, Barnet B. Bichovsky, for the fraudulent making and uttering and publishing of written instruments. Indictment No. 417 charges the issuing of a purported resolution of the First Fraternal Building and Loan Association and authorizing the borrowing from B. (Barnet Bichovsky) the sum of $3,000. The second indictment (418) charges the issuing of a note by the First Fraternal Building and Loan Association to B. (Barnet Bichovsky) for $3,000 in 1926. Jacob B. Bichovsky was a fugitive and had to be brought back from the State of New York. Jacob B. Bichovsky was the Secretary

of the Association and B. or Barnet Bichovsky was the conveyancer. Jacob B. Bichovsky was the secretary of the Barnet Nelson, Progressive Workmen's, United Workers and First Fraternal Building and Loan Associations, and B. or Barnet Bichovsky was the conveyancer to said four associations. They used the same method of obtaining money in all four associations. The total amount received by falsified minutes and false notes from the Barnet Nelson was $1,500; from Progressive Workmen's $30,000; from United Workers $11,500, and from First Fraternal $32,700, making a total of $75,700. These notes were then sold to 13 different individuals for the face value of the notes by Barnet Bichovsky and assigned by him. These defendants admitted that they had conspired to get money by these means, namely, the one to falsify a minute of the Board of Directors and obtain a false and fraudulent note, and the other knowing that these records were false had obtained the money for his own benefit thereon.

" The noteholders brought suit against the four associations for the respective amounts of their notes. Many of them were settled and as a result of the activities of these two men these four associations were liquidated, causing complete losses to the stockholders, who did not receive a cent.

" The petitioner, Jacob B. Bichovsky, states in his petition that he received no money from the association or from these notes, and that he believes that the money was actually owing to Barnet Bichovsky, but he pleaded *nolle contendere* to the conspiracy bill, No. 419, and was adjudged guilty, and admitted that he was a party to the conspiracy. It is not true that the building and loan associations suffered no pecuniary loss, and they were called upon to pay and did pay. The associations paid to the full extent of their ability to pay.

" The petitioner states that he is going into social work. What that means we do not know, but if, as would be indicated, such work would be of a guiding nature to uneducated and poor citizens it would seem that such guidance would be apt to be in a wrong direction. Certainly no salutary effect can be gained from the prosecution and sentence of this defendant if he is granted a pardon in so serious a matter.

" The Commonwealth opposes a pardon."

When the petitioner was released from prison in 1931 he came to New York. He was employed by the emergency works bureau. Later he became director of research in the Casa Italiana Education Bureau of Columbia University. While thus engaged he enrolled as a student of the Columbia University Extension from September, 1932, to June, 1934, including summer sessions of 1933 and 1934,

and in the general course for university undergraduates from September, 1934, to February, 1936, when he was awarded the degree of Bachelor of Science. Since May, 1935, he has been in charge of a W. P. A. project in the department of correction involving social service work connected with prisoners admitted to the New York City Penitentiary and the New Hampton Reformatory.

The probation department of the Court of Quarter Sessions of Philadelphia, in a letter dated June 10, 1937, in response to an inquiry by the civil service commission, wrote, with reference to the petitioner: " He was permitted to leave this State and then returned to New York, where he reported for a period of time and subsequently became a fugitive in so far as this office was concerned as we do not know his present whereabouts."

We have the additional fact that this petitioner's affidavit dated August 16, 1937, and submitted in support of his application for an order of mandamus, sets forth: " Although morally innocent, he pleaded guilty motivated by a desire to mitigate the punishment of his father, whom he desired to shield." As a matter of fact at the time petitioner pleaded guilty, his father had been sentenced to a four to ten year term in the penitentiary after pleading guilty in April, 1928, to charges of conspiracy to defraud and forgery. At that time the petitioner was a fugitive from justice. He was not apprehended by the authorities until more than a year and a half later. At the time petitioner pleaded guilty his father was serving his jail sentence.

These facts as they appear in the record establish, beyond question, that there is ample justification for the conclusion reached by the civil service commission and that any other result would have been an abuse of discretion.

The contention that the commission failed to give effect to the unconditional and complete pardon is without merit. There is language in opinions of various courts to the effect that a pardon makes of the offender a new man, as innocent as though he had never committed the offense. Upon analysis, however, such language will be found to be simply generalization. In *People* v. *Biggs* (9 Cal. [2d] 508; 71 P. [2d] 214), in discussing the authorities and the general effect of a pardon, Judge LANGDON said: " But the somewhat extravagant language occasionally employed must be contrasted with the actual decisions of the courts. It is universally established that a pardon exempts the individual from the punishment which the law inflicts for the crime which he has committed; and generally speaking, it also removes any disqualifications or disabilities which would ordinarily have followed from the conviction. To say, however, that the offender is ' a new man,' and ' as innocent as if he had never committed the offense,' is to ignore the difference between the

crime and the criminal. A person adjudged guilty of an offense is a convicted criminal, though pardoned; he may be deserving of punishment, though left unpunished; and the law may regard him as more dangerous to society than one never found guilty of crime, though it place no restraints upon him following his conviction. The criminal character or habits of the individual, the chief postulate of habitual criminal statutes, is often as clearly disclosed by a pardoned conviction as by one never condoned. The broad generalizations quoted above are, if taken too literally, logically unsound as well as historically questionable. (See Williston, Does A Pardon Blot Out Guilt?, 28 Harv. L. Rev. 647; *People* v. *Carlesi*, 154 App. Div. 481; 139 N. Y. Supp. 309; 13 Columb. L. Rev. 418; *Matter of Lavine*, 2 Cal. [2d] 324; 41 P. [2d] 161; 4 Cal. L. Rev. 236.)"

Our Court of Appeals, in *Matter of* ——————, *an Attorney* (86 N. Y. 563), said: " Doubtless the effect of the pardon is that, so far as the violation of the criminal law, the offense against the public, is concerned, he is to be looked upon as innocent thereof. The pardon does reach the offense for which he was convicted, and does blot it out, so that he may not now be looked upon as guilty of it. But it cannot wipe out the act that he did, which was adjudged an offense. It was done, and will remain a fact for all time. Notwithstanding the extensive language used in *Ex Parte Garland* [4 Wall. 380] and *In re Deming* [10 Johns. 232, 483], and that which we have used, there are limits to the effect of such a pardon. ' The word " pardon " includes a remission of the offense, or of the penalties, forfeitures or sentences growing out of it.' (Per Edmonds, J., *The People* v. *Potter*, 1 Park. Cr. 51.) The pardoned man is relieved from all the consequences which the law has annexed to the commission of the public offense of which he has been pardoned, and attains new credit and capacity, as if he had never committed that public offense. (*In re Deming, supra.*) Yet the pardon does very little toward removing the other consequences which result from the crime. [Per Bronson, J., *Baum* v. *Clause*, 5 Hill, 196.]"

It has been held that a pardon does not prevent the imposition of discipline upon an attorney who has been found guilty of a crime which involves professional misconduct. (*Matter of* ——————, *an Attorney*, 86 N. Y. 563.) Nor does a pardon restore a license to practice medicine revoked because of conviction. (*State* v. *Hazzard*, 139 Wash. 487; 247 P. 957.) Very appropriate language may be found in the opinion in *State ex rel. Attorney-General* v. *Hawkins* (44 Ohio St. 98; 5 N. E. 228): " Whatever the theory of the law may be as to the effect of a pardon, it cannot work such moral changes as to warrant the assertion that a pardoned convict is just as reliable as one who has constantly maintained the character of a good citizen."

Section 14 of the Civil Service Law provides that the municipal civil service commission " may refuse to examine an applicant or after examination to certify an eligible  *  *  *  who has been guilty of a crime or of infamous or notoriously disgraceful conduct."

In *Matter of Nalore* v. *Baker* (244 App. Div. 554) the appellant had been employed by the city of Rochester and while so employed his position was abolished and he was notified that his services would be required no longer. An alternative mandamus order was obtained to review his dismissal. Upon the trial it appeared that he had been convicted of criminally receiving stolen property and had been sentenced to Auburn State Prison for a term of from three to six years. The alternative mandamus order was dismissed, the dismissal being based upon proof of the conviction. In Rochester there is a civil service rule similar to section 14, above mentioned. The Appellate Division in the Fourth Department pointed out that the rule did not mandatorily forbid the employment in civil service of one who had been convicted of a crime, but the court said: " We conclude that the question whether petitioner's conviction of a crime in 1927 disqualifies him for civil service employment in the city of Rochester is a matter for determination by the local civil service commission, in the exercise of its administrative discretion, with all relevant facts before it for consideration. Our courts may not interfere with the exercise of discretion vested by statute in administrative officers in the absence of clear and convincing proof of improper conduct on their part."

In the face of the facts disclosed in the record and the repeated false statements made by the petitioner it is difficult to understand the attitude of the commissioner of correction or his attempt to place this man in a position of responsibility to which position only a most trustworthy person should be appointed. It seems to us that in the great city of New York with thousands unemployed, it should be a simple matter to find many efficient, honorable, capable citizens, worthy of consideration who are well qualified to fill any position in any city department.

The history of this case leads to the conclusion that the petitioner has been most fortunate in being accorded far more consideration than he is entitled to in view of his past conduct.

The civil service commission has not abused its discretion or been guilty, in any manner, of improper conduct.

The order appealed from should be affirmed, with twenty dollars costs and disbursements.

O'MALLEY, GLENNON, COHN and CALLAHAN, JJ., concur.

Order unanimously affirmed, with twenty dollars costs and disbursements.